IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 20, 2014 at Knoxville

## STATE OF TENNESSEE v. CHRISTOPHER I. THRASHER

**Appeal from the Criminal Court for Overton County**
**No. 2012-CR-48     Leon C. Burns, Jr., Judge**

---

**No. M2013-02495-CCA-R3-CD - Filed July 18, 2014**

---

The Defendant, Christopher I. Thrasher, was convicted by an Overton County jury of delivery of oxycodone within 1000 feet of a school zone, and the trial court imposed a sentence of seventeen years for that conviction. In this direct appeal, the Defendant alleges that the following errors were made at his trial: (1) that his motion to suppress should have been granted because he was under the influence of drugs at the time he waived his rights and gave his statement; (2) that the chain of custody regarding the pills was not sufficiently established; and (3) that enhancement of his sentencing term above the range minimum was improper. After a thorough review of the record and the applicable authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and JEFFREY S. BIVINS, JJ., joined.

Chasity Hancock and Kelly R. Williams, Livingston, Tennessee, for the appellant, Christopher I. Thrasher.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael A. Meyer, Deputy Attorney General; Randall A. York, District Attorney General; and Owen G. Burnett, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

This case concerns the July 22, 2011 sale of prescription narcotics from the Defendant to a confidential informant, Nick Norrod. On February 6, 2012, an Overton County grand jury indicted the Defendant for delivery of oxycodone, a Schedule II controlled substance,

within 1000 feet of a public school, a Class B felony. See Tenn. Code Ann. §§ 39-17-417, -432. Prior to trial, the Defendant filed a motion to suppress the waiver of his Miranda[1] rights and subsequent confession, arguing that his waiver and statements were not freely and voluntarily given due to his impairment at the time of the interview. Following a pretrial hearing, that motion was denied, and the Defendant proceeded to trial in June 2012.

The evidence presented at the Defendant's trial revealed the following facts. The Livingston Chief of Police Greg Etheredge received a message from Norrod, on July 22, 2011, that Norrod planned to make a drug purchase from the Defendant. Norrod, who had been stopped for speeding while driving on a suspended license, initially acted as confidential informant for the police department in exchange for release from the driving on a suspended license charge. Norrod was later compensated for his services. Norrod testified that he had a history of using prescription narcotics for pain due to "many injuries in the past[,]" so he knew individuals in the community who were selling drugs. Norrod admitted that he was taking Percocet, a medication containing oxycodone, at the time of trial.

At Chief Etheredge's request, on July 22, volunteer reserve Officer Andrew Neff picked Norrod up and drove Norrod to Chief Etheredge's house, which was about three blocks away from the Defendant's residence. Officer Neff was driving a rental car that he had cleaned very thoroughly and that did not have any drugs in it.

Once they arrived in Chief Etheredge's driveway, Norrod was searched by Jesse Brown Franklin, a narcotics detective with the Overton County Sheriff's Department. Det. Franklin searched Norrod by "pat[ting] him down from his arm pits to his ankles" and checking his pockets, clothing, and cigarette pack for various items. Det. Franklin stated that he was "confident" Norrod did not have drugs on his person before the purchase was made. Det. Franklin said that "strip search[es]" are "not practiced" in the case of confidential informants.

Norrod was outfitted with an electronic monitoring device and given $120 to purchase eight oxycodone pills from the Defendant. Around 8 p.m., Officer Neff dropped Norrod off near the Defendant's residence, and he then drove around the block for several minutes so as not to arouse suspicion. Testimony established that the Defendant's residence, 215 Zachary Street, was located within 1000 feet of A.H. Roberts Elementary School, a public elementary school in Overton County. Officer Neff did not actually witness Norrod going inside the Defendant's house.

---

[1] See Miranda v. Arizona, 384 U.S. 436, 444 (1966).

Norrod testified that he walked to the Defendant's front door, that he entered the Defendant's home, and that he then bought eight green pills from the Defendant. Norrod testified that he wrapped the pills in cellophane he had from a cigarette pack in order to keep them from "melting in [his] hand." Norrod identified the pills at trial.

Chief Etheredge testified that he was familiar with the Defendant's voice. On the audio recording from Norrod's monitoring device, the Defendant first confirmed the purchase price. Norrod then asked the Defendant if he was buying all the pills in the Defendant's possession at that time, and the Defendant responded in the affirmative. A discussion ensued about procuring more pills. Also, on the recording, Norrod stated "Chris brother[,]" calling the Defendant by his first name. Chief Etheredge confirmed that he did not visually observe the exchange.

Chief Etheredge called Officer Neff and instructed him to pick Norrod up and bring him back to Chief Etheredge's house. After Norrod got into Officer Neff's vehicle, Officer Neff observed "greenish-bluish" pills in Norrod's possession, and Officer Neff "stuck" the pills "in the center console in the cup holder" of the vehicle. When they returned to Chief Etheredge's residence, the pills were turned over to Chief Etheredge. Det. Franklin searched Norrod again by patting him down and did not find any drugs or money. However, Det. Franklin agreed that it was "possible" for an individual to hide drugs under clothing.

The Defendant challenged the chain of custody of the pills at trial. Chief Etheredge testified that the pills he received from Norrod were sealed in a plastic bag at the scene. Chief Etheredge wrote the case agency, the case number, the item number, the date, the time, the suspect, his initials on the bag, and a brief description of the controlled buy. According to Chief Etheredge, he then placed the bag into a safe inside the detectives' office once back at the station.

Detective Jacob Boswell stated that, on July 22, 2011, he retrieved the evidence from the safe where Chief Etheredge placed it and typed a Tennessee Bureau of Investigation ("TBI") Request for Examination form, with the case number assigned to the evidence, the quantity of pills, and a statement of facts. Det. Boswell also prepared an "Evidence Receipt," an internal Livingston Police Department document to track the evidence within the department. Det. Boswell said that he then placed the evidence into the evidence lockers, from which Amy Rhoton retrieved it later.

At the bottom of the Evidence Receipt, Det. Boswell typed that the evidence was "Released by: Greg Etheredge" and "Released to: Greg Etheredge." Det. Boswell testified that this was in error: "[O]n the 'Released to,' would have been a typographical error, because I usually put 'evidence' there instead of Chief Etheredge's name."

-3-

Amy Rhoton, the evidence technician, secretary, and clerk for the Livingston Police Department, explained that it was her job to retrieve evidence from the lockers, enter the evidence into the system, place it into the evidence room or send it to the lab, and prepare a narrative sheet for each piece of evidence. Only she could open the evidence lockers once they were closed. Rhoton testified that, in this matter specifically, she retrieved the evidence, described as "eight green pills," from the locker on August 18, 2011, and prepared a narrative sheet. She also wrote similar information on the Evidence Receipt prepared by Det. Boswell.

Detective Gary Ledbetter testified that he took the evidence, sealed in a transparent plastic container, from the Livingston Police Department to the TBI Crime Lab on August 19, 2011. He signed the TBI Request for Examination form, stating that he was the submitting individual, and the lab technician who received the evidence signed the document as "J. Gillis."

Robert Mark Young, a Special Agent Forensic Scientist with the TBI Crime Lab in Nashville, testified, based upon the information contained in the Request for Examination form, that on August 19, 2011, Officer Ledbetter submitted the evidence to the evidence technician, Jennifer Gillis. According to Agent Young, Ms. Gillis would have then secured the evidence in the vault. Agent Young requested the evidence on August 30, 2011, and he placed it in his personal vault until he analyzed it on September 6, 2011. The evidence did not exhibit any signs of tampering according to Agent Young. After testing, he re-sealed the bag and returned the pills to "Evidence Receiving[,]" where it was again secured in the evidence vault. Agent Young testified that the pills appeared to be oxycodone-containing pharmaceuticals based upon their initial appearance, and his testing confirmed that the pills did in fact contain oxycodone, a Schedule II controlled substance. After analysis, the evidence was sent back to the vault until September 28 or 29, 2011, when Rhoton picked up the evidence from the lab. Rhoton then stored the pills in the evidence room of the Livingston Police Department until trial.

The State introduced an exhibit of seven and one-half green pills. Testimony established that one-half of a pill was used in the TBI's testing.

Rodney Morton, a Special Agent Criminal Investigator with the Office of the Inspector General, testified that he assisted in the Defendant's arrest on February 13, 2012. Agent Morton accompanied Livingston police officers to the Defendant's residence and then back to the police department where the Defendant was interviewed by Chief Etheredge. Agent Morton witnessed the Defendant's waiver of his Miranda rights after a formal reading, that waiver occurring at 7:58 a.m., and the Defendant's statements thereafter. According to Agent Morton, the Defendant did not appear to be impaired by drugs or medication, was "fully conscious[,]" and knew "what he was doing when he gave [his] statement[.]" Agent

Morton stated that neither he nor Chief Etheredge coerced or threatened the Defendant in any way. Agent Morton testified that the Defendant admitted to selling drugs from July 2011 to October or late November 2011.

Chief Etheredge confirmed that the Defendant was read his Miranda rights and that the Defendant gave a statement on February 13, 2012. In the statement, the Defendant admitted that he was advised of his Miranda rights and signed a wavier agreeing to speak with Chief Etheredge about selling drugs. The Defendant admitted to selling "Percocet and Alprazolam[] about a half dozen times" between July 2011 to October or late November of 2011. He described his involvement in the drug sales, stating that he often "played the middle man[.]"

Chief Etheredge explained that he typed what the Defendant told him and read it on a computer screen with the Defendant line-by-line. The Defendant initialed each paragraph and signed each page of the statement. According to Chief Etheredge, the Defendant did not appear to be impaired "by any pharmaceuticals, or any other substance, or drug" while giving his statement. Chief Etheredge admitted that he never asked the Defendant if he had taken any medication prior to the interview.

The money used during the controlled buy was never recovered.

The Defendant testified that, on February 13, 2011, the day of his arrest and statement, he had not slept for four nights. According to the Defendant, he suffered from "obstructive sleep apnea" and had taken two five-milligram Xanax pills around 4:30 a.m. for this condition. The Defendant said that these pills had been prescribed to him by his doctor and that he used them as directed. The Defendant remembered a knock at his door on the morning of February 13th and then remembered waking up "in booking at the county jail" around lunchtime. He did not remember making a statement and did not remember being advised of his Miranda rights. The Defendant testified that he could not imagine "mak[ing] a statement like" the one that was given to Chief Etheredge "in the right state of mind."

The Defendant testified that he had known Norrod since sixth grade or elementary school. He stated that he did not call Norrod on July 22 to set up a drug deal. According to the Defendant, Norrod dropped by that day unannounced around 7:30 or 8:00 p.m. The Defendant testified that, on that evening, Norrod brought him some Roxicodone, an oxycodone-containing narcotic, and that he took them from Norrod because he was out of pain medications. The Defendant stated that Norrod said he was getting the medications from Sparta, Tennessee. According to the Defendant, Norrod was a "pretty big player in this narcotics trafficking district" and selling drugs was his livelihood.

On cross-examination, the Defendant stated that he could not recall that, at a prior hearing, he was unable to remember the police coming to his home on February 13, 2011. The Defendant agreed that he had signed the waiver of rights form and initialed the statement made to Chief Etheredge. The Defendant averred that he had not sold prescription pills.

Based upon the foregoing, the jury found the Defendant guilty as charged. Thereafter, the trial court sentenced the Defendant as a Range II, persistent offender to seventeen years for his conviction with twelve years to be served at one hundred percent, followed by service of the remaining years at thirty-five percent. This appeal followed.

## ANALYSIS

On appeal, the Defendant challenges (1) the denial of his motion to suppress his statement; (2) the chain of custody of the pills; and (3) the enhancement of his sentencing term. We will address each in turn.

### I. Motion to Suppress

On appeal, the Defendant argues that the trial court should have suppressed his statement to Chief Etheredge because his intoxication rendered the statement involuntary. Specifically, the Defendant contends that, because he was never asked during the interview if he was under the influence of drugs or alcohol, and because he had taken Xanax about four hours prior to the interview, he could not have understood his actions in signing a Miranda waiver and giving a statement. The State responds that the trial court did not err by refusing to suppress the statement.

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). The prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. However, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Meeks, 262 S.W.3d at 722. In reviewing a trial court's ruling on a motion to

suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

"The Fifth Amendment to the United States Constitution provides in part that 'no person . . . shall be compelled in any criminal case to be a witness against himself.'" State v. Thacker, 164 S.W.3d 208, 248 (Tenn. 2005) (quoting U.S. Const. amend. V). "Similarly, Article I, section 9 of the Tennessee Constitution states that 'in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself.'" Id. (quoting Tenn. Const. art. I, § 9). Notwithstanding, an accused may waive his right against self-incrimination. Id. (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). The accused's waiver of his right against self-incrimination under Miranda must be made intelligently, knowingly, and voluntarily to be held constitutional. Id. (citing Miranda, 384 U.S. at 444).

The United States Supreme Court has interpreted the Fifth Amendment in part to require that an incriminating statement or confession be freely and voluntarily given in order to be admissible. This even applies to statements obtained after the proper Miranda warnings have been issued. Statements and confessions not made as a result of custodial interrogations must also be voluntary to be admissible. See Arizona v. Fulminante, 499 U.S. 279, 286-88 (1991). In order to be considered voluntary, the statement must not be extracted by "any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (quoting Bram v. United States, 168 U.S. 532, 542-43). Moreover, due process requires that confessions tendered in response to either physical or psychological coercion be suppressed. Rogers v. Richmond, 365 U.S. 534, 540-41 (1961). This has evolved into the "totality of circumstances" test to determine whether a confession is voluntary. Thacker, 164 S.W.3d at 248 (internal citations omitted). Thus, to determine whether an accused's statements were voluntary, the appellate courts review the totality of the circumstances surrounding the waiver of the right against self-incrimination. Id. at 249 (citing State v. Stephenson, 878 S.W.2d 530, 545 (Tenn. 1994), abrogated on other grounds by State v. Saylor, 117 S.W.3d 239 (Tenn. 2003)).

Moreover, the voluntariness test under the Tennessee Constitution has been held to be more protective of individual rights that the federal test under the United States Constitution. Id. (citing Stephenson, 828 S.W.2d at 547). For the relinquishment of rights to be effective, the defendant must have personal awareness of both the nature of the right and the consequences of abandoning his rights. Id. (citing Stephenson, 828 S.W.2d at 544-45).

The trial court held a pretrial hearing on the motion and heard testimony from Chief Etheredge, the Defendant, and Agent Morton, the parties present at the time the Defendant

-7-

gave his statement. Chief Etheredge testified that the Defendant had a high school education, seemed cognizant at the time of the interview, and did not have slurred speech. Chief Etheredge stated that he advised the Defendant of his Miranda rights verbally and then handed the Defendant a written copy and asked him to read it. Both the Defendant and Chief Etheredge signed the waiver of rights. Chief Etheredge testified that he did not begin questioning the Defendant until after the Defendant had signed the waiver. Agent Morton, who witnessed the waiver and subsequent confession, testified that the Defendant "did not appear to be under the influence of any medications or substances at all" and cited his seventeen years' experience in law enforcement and nursing education in judging the Defendant's demeanor. The Defendant claimed that he only remembered waking up at the police station around lunchtime and had no recollection of giving a statement. The court found that the Defendant's confession was given voluntarily and denied the motion to suppress. The trial court reasoned, "[I]t's pretty clear that it was a voluntary statement."; "Chief Etheredge and Agent Morton] [have] a lot of experience combined and a lot of interviews."; "There's no dispute you signed these documents. You admitted to that."; and "[There were] [n]o indications of your inability to understand what was going on, other than from your own testimony, and I just don't think that is accurate."

The Defendant cites State v. David Bornfriend, No. 02C01-9708-CC-00297, 1998 WL 641336 (Tenn. Crim. App. Sept. 21, 1998), in which the State appealed from a judgment of the trial court to suppress statements made by the defendant while he was in the hospital and being given intravenous narcotic pain medication after he was burned in a fire. The court found that the defendant was so impaired by the IV narcotics that his statements to the police could not have been "the product of a rational intellect and a free will," and thus, his statements were properly suppressed. Id. at *4-5 (citing Vandergriff v. State, 409 S.W.2d 370, 373 (Tenn. 1966); State v. Robinson, 622 S.W.2d 62, 67 (Tenn. Crim. App. 1980)).

Generally, a confession is admissible even though a defendant is under the influence of alcohol or narcotic drugs "if … the accused was capable of making a narrative of past events or of stating his own participation in the crime." State v. Green, 613 S.W.2d 229, 232 (Tenn. Crim. App. 1980). The Defendant provides no authority, and we know of none, that requires that he be specifically asked by the interrogating officers whether he is under the influence of drugs or alcohol. According to Chief Etheredge's testimony, the Defendant was able to give a statement that described "how he would sell drugs." At trial, Chief Etheredge stated that he typed what the Defendant told him and read it on a computer screen with the Defendant line-by-line; the Defendant then initialed each paragraph and signed each page of the statement. The statement and waiver of rights are both signed by the Defendant, Chief Etheredge, and Agent Morton. The Defendant did not seem impaired or under the influence of any intoxicant according to Chief Etheredge and Agent Morton. The trial court accredited their testimony.

-8-

We conclude that the evidence presented at trial shows that, under the totality of the circumstances surrounding the interview, the Defendant voluntarily, knowingly, and understandingly waived his Miranda rights and gave a confession. See, e.g., State v. Kewan Callicutt, No. W2011-02516-CCA-R3-CD, 2013 WL 3455643, at *5 (Tenn. Crim. App. July 5, 2013) (evidence did not preponderate against the trial court's accreditation of detective's testimony that the defendant did not appear under the influence of any drug or intoxicant). Accordingly, the trial court's denial of the motion to suppress is affirmed.

## II. Chain of Custody

The Defendant contends that the trial court erred by admitting the pills when the State did not sufficiently establish the chain of custody. Specifically, he contests the chain of custody because "[t]estimony shows that there were numerous chances for the pills . . . to be tampered with, swapped, lost, and replaced with no physical paperwork showing who was in possession of them at given time" while in the possession of the Livingston Police Department. The State avers that the trial court did not err by refusing to exclude the evidence.

The determination of whether the State has properly established the chain of custody of evidence is a matter left to the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. See State v. Cannon, 254 S.W.3d 287, 295 (Tenn. 2008). Generally, "[a] trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." State v. Phelps, 329 S.W.3d 436, 443 (Tenn. 2010). Tennessee Rule of Evidence 901(a) provides: "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Our supreme court has held, "'[A]s a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody.'" Cannon, 254 S.W.3d at 296 (quoting State v. Scott, 33 S.W.3d 746, 760 (Tenn. 2000)). "The purpose of the chain of custody is to 'demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" Scott, 33 S.W.3d at 760 (quoting State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). The State should sufficiently prove each link in the chain of custody, but the State is not required to prove the identity of tangible evidence beyond all possibility of doubt nor must it exclude every possibility of tampering. Cannon, 254 S.W.3d at 296. In addition, the State's failure to call as a witness each person who handled an item does not necessarily preclude the admission of the evidence. Id. "Accordingly, when the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." Id. The trial court should not admit an item into evidence if the State fails to

provide sufficient proof of the chain of custody, unless the identity and integrity of the item can be established by other means.  Id.

The Defendant challenges the actions of Chief Etheredge, evidence technician Rhoton, Det. Ledbetter, and Det. Boswell, asserting that Livingston Police Department "office personnel are free to take evidence as they please without accountability."  The trial court determined that the chain of custody had been sufficiently established and admitted the pills as evidence.

In this case, Chief Etheredge testified that he received the pills when Norrod and Officer Neff returned to his residence following the controlled buy.  Chief Etheredge then sealed the pills in a plastic bag and placed them in a safe in the detectives' office.  Det. Boswell stated that he retrieved the pills and prepared the TBI Request for Examination form and an Evidence Receipt.  Det. Boswell explained that he made a typographical error on the Evidence Receipt.  Det. Boswell stated that, after preparing these documents, he took the pills to the evidence locker, which only Rhoton could open.  Rhoton removed the pills on August 18, 2011, and prepared a narrative sheet.  The pills were then delivered to the TBI lab by Det. Ledbetter, who signed the Request for Examination form.  Following the TBI analysis, Rhoton picked up the pills and placed them in the evidence room at the police department.  The Defendant makes no challenge to the evidence while in the custody of the TBI.  Based on the record before us, we conclude that the trial court did not abuse its discretion in ruling that the State sufficiently established the chain of custody.

*III. Sentencing*

The Defendant contends that the trial court's sentencing of seventeen years' incarceration is excessive.  The Defendant notes that his two prior felony convictions occurred before 1992, that he has not been convicted of any other felonies since then, that he does not have a violent criminal history, and that his conduct neither caused nor threatened serious bodily injury.  He extrapolates that his seventeen-year sentence "does not serve the purpose the legislature intended."  The State responds that the seventeen-year sentence was proper.

At the sentencing hearing, Robbie Phillips, an employee with the Tennessee Department of Correction, Division of Probation and Parole, testified that he had prepared a presentence report on the Defendant.  The report included the Defendant's prior convictions for the sale of Schedule II drugs on January 8, 1990, and January 10, 1990, for which the Defendant was convicted on August 13, 1991.  The Defendant had prior convictions for driving under the influence, domestic violence, casual exchange, and several traffic violations.  The Defendant had previously been granted pretrial diversion in 1990 on a burglary charge.  Mr. Phillips also testified that the Defendant admitted to using marijuana

and hydrocodone while released on bond after the trial and before sentencing and executed a signed statement to that effect.

Officer Michael Wright, a probation officer with Community Probation Services and the Defendant's supervising officer, testified that the Defendant pled guilty on February 7, 2011, to the simple possession of a Schedule II drug. He was granted probation for eleven months and twenty-nine days, which would have ended February 5, 2012, according to Officer Wright. The Defendant was indicted in the present matter one day after his probation expired from that conviction. The date of the Schedule II delivery offense in this case, July 22, 2011, would have been a probation violation, if Officer Wright had known about it.

Chief Etheredge testified that two other indictments remained open on the Defendant for Schedule II drug sales. The Defendant had also been charged with TennCare fraud because he had obtained some of his prescription narcotics while on TennCare. Chief Etheredge also stated that the Defendant failed to appear for his first sentencing hearing in this matter on August 15, 2012, and a capias warrant was issued. Ultimately, Chief Etheredge and other officers found the Defendant in Indiana. When found, the Defendant had with him two forms of identification, including his own driver's license and the driver's license of an individual who drove the Defendant to Indiana. He also had the birth certificate of his deceased brother-in-law.

Det. Franklin testified that he participated in another undercover purchase of oxycodone from the Defendant on October 15, 2011. This transaction likewise occurred at the Defendant's residence on Zachary Street. Det. Franklin provided the details surrounding that controlled buy. According to Det. Franklin, this allegation was being pursued in a separate charge.

Det. Boswell testified that he participated in another undercover purchase of oxycodone from the Defendant on September 19, 2011, in a McDonald's parking lot. Det. Boswell provided the details of this buy, including that the transaction again occurred is within 1000 feet of school. This allegation was also being pursued in a separate charge.

Emily Thrasher, the Defendant's daughter, testified that the Defendant was a good person; that his mother was sick, and he needed to be out of prison to take care of her; and that the he had provided for his family. According to Ms. Thrasher, "[fourteen] years [was] . . . a little much" for the Defendant.

The trial court found that the Defendant was a Range II, persistent offender for a Class B felony; therefore, he was subject to a sentence between twelve and twenty years. See Tenn. Code Ann. § 40-35-112(b)(2). The trial court concluded that the following

enhancement factors applied: (1) The Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the range; (8) The Defendant, before sentencing, failed to comply with the conditions of a sentence involving release into the community; and (13) At the time the felony was committed, the Defendant was released on probation. See Tenn. Code Ann. § 40-35-114. The trial court concluded that one mitigating factor applied, that the Defendant's criminal conduct neither caused nor threatened serious bodily injury. See Tenn. Code Ann. § 40-35-113. Additionally, the trial court noted that Overton County faced a "huge problem" with individuals filling prescriptions given from a doctor for narcotics then reselling them.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b). When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). State v. Carter, 254 S.W.3d 335, 344 (Tenn. 2007). Moreover, appellate courts may not disturb the sentence even if we had preferred a different result. See id. at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2010), Sentencing Comm'n Cmts.; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

The Defendant had two prior convictions for felonies that were also Class B offenses; the Defendant makes no real argument that he was improperly sentenced as a Range II,

persistent offender.[2] The trial court applied enhancement factor (1) because, in addition to those prior convictions, the Defendant had more recent convictions and charges. He also admitted to using drugs while awaiting sentencing. The trial court stated that the Defendant did not comply with the terms of his release because he failed to appear for sentencing and had to be arrested before returning to be sentenced, thus, determining that factor (8) was applicable. The trial court stated that factor (13) was an applicable enhancing factor because the Defendant committed this crime while on probation for another offense. The trial court also concluded that mitigating factor (1) applied. The court explained that "selling six pills … would not seem to be a serious offense, in and of itself, except that we are awash with the sale of drugs of that nature in this county . . . . We should punish to provide a general deterrent to others . . . [and] to restrain people with a lengthy history of criminal conduct." See Tenn. Code Ann. § 40-35-103(1)(B) (stating that a trial court may consider whether confinement will have a deterrent effect on others). The trial court stated that less restrictive measures than incarceration had previously been applied to the Defendant and had been unsuccessful. See Tenn. Code Ann. § 40-35-103(1)(C).

After reviewing the record and applicable authorities, we conclude that the trial court did not abuse its discretion in sentencing the Defendant to seventeen years. The trial court applied three enhancing factors and one mitigating factor to the Defendant's sentence, as well as general information about a drug problem in Overton County. Because the application of enhancement and mitigating factors to adjust a sentence was rendered advisory by the 2005 amendments, we reiterate that the trial court may set a sentence anywhere within the applicable range so long as the sentence is consistent with the principles and purposes of the Act, regardless of the presence or absence of mitigating and enhancement factors. Based on our review, we conclude that the record supports the trial court's discretionary decision to impose an enhanced sentence of seventeen years. The sentencing decision is affirmed.

## CONCLUSION

In sum, we conclude that the trial court did not err in denying the Defendant's motion to suppress, that the evidence is sufficient to sustain the Defendant's conviction, and that the imposition of an enhanced sentencing term was proper. Accordingly, we affirm the judgment of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE

---

[2] This court has previously held that "[t]here appears to be no doubt that the legislature intended to permit consideration of all prior felony convictions occurring during the defendant's life" in classifying a defendant's sentencing range. State v. Wright, 836 S.W.2d 130, 136 (Tenn. Crim. App. 1992).